UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                                    08 Cr. 709 (DLC)

MARTIN SMELING NUNEZ,
a/k/a "Chico,"

Defendant.

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT'S MOTION FOR A WRIT OF CORAM NOBIS**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrew A. Rohrbach
Assistant United States Attorney
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ............................................................................................... 2

    A.   Criminal Case ..................................................................................... 2

    B.   Immigration History ............................................................................ 3

LEGAL STANDARD ......................................................................................... 5

ARGUMENT .................................................................................................. 6

I.   Nunez's Counsel Did Not Perform Unreasonably ..................................... 7

    A.   Even after *Padilla v. Kentucky*, the Sixth Amendment Right to Counsel Does Not Apply to Collateral Consequences .................................................... 7

    B.   Civil Denaturalization Is at Most a Collateral Consequence ...................... 10

    C.   Nunez's Counsel Gave Reasonable Advice ........................................... 13

II.   Nunez Was Not Prejudiced By Any Error By His Counsel ......................... 15

CONCLUSION ............................................................................................... 20

# **TABLE OF AUTHORITIES**

**Cases**

*Chaidez v. United States*, 568 U.S. 342 (2013) ....................................................... 8, 9

*Doe v. United States*, 915 F.3d 905 (2d Cir. 2019)...................................... 6, 15, 16, 18

*Jae Lee v. United States*, 137 S. Ct. 1958 (2017)) ........................................... 15, 17, 18

*Kovacs v. United States*, 744 F.3d 44 (2d Cir. 2014)................................ 6, 13, 14, 15, 16, 18, 19

*Kungys v. United States*, 485 U.S. 759 (1988)............................................................ 12

*McMann v. Richardson*, 397 U.S. 759 (1970) ............................................................. 7

*Michel v. United States*, 507 F.2d 461 (2d Cir. 1974) .................................................. 8

*Missouri v. Frye*, 566 U.S. 134 (2012) ..................................................................... 19

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................... 6, 8, 9, 11, 12

*Pizzuti v. United States*, No. 01 Cr. 1122 (LAP), 2019 WL 274968 (S.D.N.Y. Jan. 10, 2019) .. 11, 12, 14

*Rodriguez v. United States*, 730 F. App'x 39 (2d Cir. 2019)...................... 14, 16, 17, 18

*Russo v. United States*, 173 F.3d 846 (2d Cir. 1999)..................................................... 8

*Strickland v. Washington*, 466 U.S. 668 (1984) .............................................. 6, 8, 13

*United States v. Ash*, 413 U.S. 300 (1973).................................................................. 7

*United States v. Castro-Taveras*, 841 F.3d 34 (1st Cir. 2016)..................................... 13

*United States v. Cohen*, 427 F.3d 164 (2d Cir. 2005)................................................. 15

*United States v. Couto*, 311 F.3d 179 (2d Cir. 2002).................................................. 14

*United States v. Denedo*, 556 U.S. 904 (2009) ............................................................ 5

*United States v. Lemos*, No. 08 Civ. 11144 (KMW), 2010 WL 1192095 (S.D.N.Y. Mar. 26, 2010) ............................................................................................................... 10

*United States v. Mandanici*, 205 F.3d 519 (2d Cir. 2000) ........................................... 5

*United States v. Morrison*, 449 U.S. 361 (1981) ......................................................... 7

*United States v. Phattey*, -- F.3d --, 2019 WL 6605781 (9th Cir. Dec. 5, 2019) .......... 12

*United States v. Wade*, 388 U.S. 218 (1967) .............................................................. 7

*United States v. Youngs*, 687 F.3d 56 (2d Cir. 2012).......................................... 8, 9, 12

**Statutes**

18 U.S.C. § 3553................................................................................................. 3, 17

18 U.S.C. § 3582 ......................................................................................................... 3

21 U.S.C. § 812 ........................................................................................................... 2

21 U.S.C. § 841 .................................................................................................. 2, 3, 17

21 U.S.C. § 846 ........................................................................................................ 1, 2

8 C.F.R. § 316.10 ........................................................................................................ 3

8 U.S.C. § 1101 ......................................................................................................... 10

8 U.S.C. § 1182 ......................................................................................................... 10

8 U.S.C. § 1227 ......................................................................................................... 11

8 U.S.C. § 1427 ........................................................................................................... 3

8 U.S.C. § 1451 ..................................................................................................... 4, 10

## Other Authorities

2d Cir. Local R. 32.1.1(a). ........................................................................................ 14

ABA Criminal Justice Standards for the Defense Function 4th Ed. (2017) ................................ 14

Cassandra Burke Robertson & Irina D. Manta, "(Un)Civil Denaturalization," 94 N.Y.U. L. Rev. 402 (2019) ........................................................................................ 13

Patrick Weil, The Sovereign Citizen: Denaturalization and the Origins of the American Republic (2013) .......................................................................................... 13

U.S. Const. Amend. VI. ............................................................................................... 7

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Martin Smeling Nunez's motion for a writ of error *coram nobis*.  On October 22, 2008, Nunez pleaded guilty to a one-count superseding indictment charging him with conspiracy to distribute and possess with intent to distribute heroin and crack cocaine, in violation of 21 U.S.C. § 846.  Nunez now seeks to vacate that guilty plea on the ground that his prior counsel incorrectly advised him that pleading guilty would have no immigration consequences.  Instead, Nunez, a naturalized citizen, is currently subject to denaturalization proceedings because his criminal conduct occurred during the time period when Nunez was required to show good moral character in order to be eligible for naturalization.

The Court should reject this argument.  First, Nunez's defense counsel did not violate Nunez's Sixth Amendment rights.  The Sixth Amendment does not require defense counsel to give advice about the risk of civil denaturalization, as opposed to deportation, which is at most a collateral consequence of the criminal proceeding.  While the Sixth Amendment generally requires defense counsel to act reasonably in giving advice to clients, including by avoiding unreasonable misadvice, Nunez's counsel cleared that bar.  Second, Nunez cannot establish prejudice because he cannot show that he placed great emphasis on immigration consequences in his plea decision, and because even if he had been advised of the possibility of denaturalization, the outcome of the proceeding would have been the same.

For these reasons, the Court should deny Nunez's petition.  In the alternative, the Court should give the Government an opportunity to obtain a privilege waiver from Nunez and inquire from Nunez's counsel as to whether his performance was in fact constitutionally deficient.

1

## BACKGROUND

**A.     Criminal Case**

This case stemmed from the work of a paid informant ("CW-1") for the Federal Bureau of Investigation ("FBI").  According to the Presentence Investigation Report ("PSR"), in November 2007, that informant learned that Nunez was a narcotics supplier.  PSR ¶ 11.  CW-1 met several times with Nunez in the Bronx, and they discussed sales of heroin from Nunez to the informant.  PSR ¶ 11.  Their conversations continued into early January 2008, when CW-1 recorded a series of phone calls in which Nunez agreed to sell CW-1 44 grams of heroin at $60 per gram.  PSR ¶ 12.

Nunez ultimately sold CW-1 drugs in three occasions.  On January 10 and January 25, 2008, CW-1 purchased a total of 104.1 grams of heroin from Nunez at $60 per gram.  PSR ¶¶ 13–17.  On June 23, 2008, Nunez and his co-conspirator sold approximately 99.1 grams of crack cocaine.  PSR ¶ 18.  All three buys were recorded by audio.  *See* PSR ¶¶ 13, 15 (referencing audio recordings of two of the buys).

Nunez and CW-1 communicated in part through a phone number provided by Nunez.  That number was subscribed to "Martin Smeling Nunez."  PSR ¶ 19.  Law enforcement also obtained an immigration photograph and Department of Motor Vehicles photograph of "Martin Smeling Nunez," both of which CW-1 identified as depicting the person from whom he purchased drugs.  PSR ¶ 19.

On October 22, 2008, Nunez pleaded guilty to a one-count superseding indictment charging him with conspiracy to distribute and possess with intent to distribute 100 grams and more of heroin and 50 grams and more of crack cocaine, in violation of 21 U.S.C.§§ 812, 841(a)(1), 841(b)(1)(A) & (B), and 846.  The conspiracy charged in the indictment included four

2

overt acts: a 2007 meeting between the co-conspirators and the three drug sales.  Due to the drug weight, Nunez was subject to a 10-year mandatory minimum.  *See* 21 U.S.C. § 841(b)(1)(A).  By application of the "safety value," *see* 18 U.S.C. § 3553(f), however, Nunez was sentenced on February 6, 2009, principally to 57 months' imprisonment and 5 years' supervised release.

On March 12, 2010, Nunez filed a motion for relief under 28 U.S.C. § 2255, arguing that his counsel was constitutionally ineffective by failing to seek a downward departure at sentencing.  This Court denied the motion on August 2, 2010.

On December 28, 2011, Nunez moved for a retroactive sentence reduction in light of amendments to the Sentencing Guidelines for offenses involving crack cocaine.  *See* 18 U.S.C. § 3582(c)(2). The Government did not oppose the motion, and, on April 20, 2012, Nunez was resentenced to 47 months' imprisonment—within the revised Guidelines range—followed by 5 years' supervised release.

Nunez moved for early termination of his supervised release on September 12, 2016.  The Court denied that motion, and Nunez has now completed his supervision.

### B.      Immigration History

On January 11, 2008, Nunez was granted United States citizenship and issued a certificate of naturalization.  As part of that application process, Nunez was required to prove that he was, and continued to be, a person of good moral character during the statutory period: from five years before he applied for naturalization—May 7, 2007—until the date he received citizenship.  *See* 8 U.S.C. § 1427(a); 8 C.F.R. § 316.10(a)(1).  At the oath ceremony to complete the naturalization process, Nunez completed and signed a form which asked whether he had knowingly committed any crimes for which he had not been arrested, and Nunez answered in the

negative.  *See* Affidavit of Good Cause at 4, 8 *Untied States v. Nunez*, No. 16-cv-3485-FB

(E.D.N.Y.), ECF No. 1 (the "Denat. Complaint").

On June 24, 2016, the United States Attorney's Office for the Eastern District of New

York initiated denaturalization proceedings against Nunez pursuant to 8 U.S.C. § 1451.  That

section requires a federal district court to revoke an individual's naturalization if the

naturalization was illegally procured, or if the naturalization was procured by concealment of a

material fact or by willful misrepresentation.  *Id.* § 1451(a).  The complaint alleges (1) that

Nunez illegally procured naturalization because he committed a crime of moral turpitude during

the statutory period, showing an absence of the statutorily required good moral character, Denat.

Complaint ¶ IV.A; and (2) that Nunez procured naturalization by concealment of a material fact

and willful misrepresentation, namely, that Nunez engaged in a conspiracy to distribute and

possess with intent to distribute heroin and crack cocaine, which he intentionally concealed and

misrepresented during the naturalization process, *id.* ¶  V; *see also* Memoranda of Law, *United*

*States v. Nunez*, No. 16-cv-3485-FB (E.D.N.Y.), ECF Nos. 23, 27.

After Nunez answered the complaint, the Government moved for judgment on the

pleadings.  The district court denied the motion on March 21, 2019.  *See* Mem. and Order

("Op."), *United States v. Nunez*, No. 16-cv-3485-FB (E.D.N.Y.), ECF  No. 31.  The court

explained that Nunez had conceded that he pleaded guilty to conspiracy to distribute heroin and

crack cocaine, but Nunez denied that it occurred before he became a citizen.  *Id.* at 3.  In the

court's view, Nunez's conviction did not collaterally estop him from contesting the date of his

offense, because the date could not be conclusively established by his guilty plea allocution or

the PSR.  The plea allocution, the court explained, could be read to describe conduct beginning

in February 2008, *see id.* at 5, and Nunez had no reason to litigate—and so could not be held

to—the dates in the PSR, *see id.* at 7–8.

After discovery began, Nunez changed counsel and sought a stay of his immigration case

so he could seek vacatur of his guilty plea.  Nunez filed a motion for a writ of *coram nobis* in this

Court on October 25, 2019.  According to Nunez's affidavit attached to the motion, he told his

defense counsel that he had been naturalized on January 11, 2008, and he repeatedly raised

concerns about his immigration status, but his lawyer told him that he had no "immigration

problems" because he was a citizen.  Affidavit of Martin Smeling Nunez ¶¶ 9–20, ECF No. 95-1.

Nunez states that, had he been properly advised, he would not have pleaded guilty.  *Id.* ¶ 33.

The United States District Court for the Eastern District of New York stayed its case on

October 31, 2019.  This Court ordered the Government to respond to the motion on November 7,

2019.

## **LEGAL STANDARD**

The writ of error *coram nobis* is limited to "extraordinary cases presenting circumstances

compelling its use to achieve justice." *United States v. Denedo*, 556 U.S. 904, 911 (2009)

(internal quotation marks omitted).  "[R]elief under the writ" is only available where "errors of

the most fundamental character have rendered the proceeding itself irregular and invalid."

*United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir. 2000) (internal quotation marks omitted).

"In reviewing a petition for the writ, a court must presume that the proceedings were correct, and

the burden of showing otherwise rests on the petitioner."  *Id.*

A petitioner may receive *coram nobis* relief upon demonstrating (1) that "there are

circumstances compelling such action to achieve justice," (2) that "sound reasons exist for failure

to seek appropriate earlier relief," and (3) that "the petitioner continues to suffer legal

consequences from his conviction that may be remedied by granting the writ." *Doe v. United States*, 915 F.3d 905, 910 (2d Cir. 2019) (internal quotation marks omitted).

Nunez argues that he is entitled to *coram nobis* relief because he received affirmative misadvice from his criminal defense counsel about the consequences of his guilty plea, which he argues constitutes ineffective assistance of counsel. "[I]neffective assistance of counsel is one ground for granting a writ of *coram nobis*." *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014). To demonstrate ineffective assistance, a petitioner must show both that "defense counsel's performance was objectively unreasonable and that the deficient performance prejudiced the defense." *Doe*, 915 F.3d at 910 (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)) (internal quotation marks omitted). Nunez's argument fails at both steps of the inquiry.

## ARGUMENT

Under the Sixth Amendment, a defendant is entitled to effective assistance of counsel in a criminal proceeding. Nunez argues that he received ineffective assistance because, in connection with his plea, he was misadvised by his criminal defense counsel that he faced no immigration risks.[1]

Nunez is incorrect. The Sixth Amendment does not apply to advice about collateral consequences, and civil denaturalization is at most a collateral consequence. *Padilla v. Kentucky*, 559 U.S. 356 (2010)—which held that the Sixth Amendment reaches advice to

---

[1] At points in the defense brief, Nunez appears to suggest that, because the Court did not advise him about the possibility of civil denaturalization during the plea colloquy, his plea was also not knowing and voluntary. (*See* Mem. at 14.) However, Nunez stops short of asserting a Fifth Amendment Due Process claim on that ground, so the Government does not respond to any such claim here. Should Nunez later claim that the instant motion includes a Fifth Amendment argument, the Government reserves the right to submit additional briefing responding to that argument.

noncitizens about deportation—is inapplicable to advice to U.S. citizens about the possibility of civil denaturalization.  Instead, the only ineffective-assistance claim available to Nunez is based on a general theory that an attorney should not give affirmative misadvice.  Under the standards of attorney performance in place at the time of the plea, however, Nunez's counsel acted reasonably.  And in any event, Nunez cannot show that he was prejudiced.

## I.      Nunez's Counsel Did Not Perform Unreasonably

Nunez draws from cases in the deportation context, rather than the denaturalization context, to argue that his defense counsel performed deficiently.  That analogy is flawed because no such right exists with respect to advice on civil denaturalization, which is a collateral consequence of conviction.  Nunez's defense counsel otherwise acted reasonably, notwithstanding his alleged misadvice.

### A.      Even after *Padilla v. Kentucky*, the Sixth Amendment Right to Counsel Does Not Apply to Collateral Consequences

The Sixth Amendment provides that in "all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. Amend. VI.   Historically centered on the right to counsel at trial, *United States v. Ash*, 413 U.S. 300, 309 (1973), the Sixth Amendment has been interpreted over time to encompass "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade*, 388 U.S. 218, 226 (1967).  It remains the case, however, that the purpose of the right to counsel is "to assure fairness in the *adversary criminal process*." *United States v. Morrison*, 449 U.S. 361, 364 (1981) (emphasis added).  The Sixth Amendment does not guarantee assistance of counsel outside the criminal process.

Where the right to counsel exists, it encompasses "the right to the effective assistance of counsel," *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970), and claims of ineffective

assistance must be considered under the test set forth in *Strickland v. Washington*, 466 U.S. 668,

686 (1984).  However, if, as a "threshold" matter, the Sixth Amendment does not apply, no

*Strickland* analysis is necessary.  *Chaidez v. United States*, 568 U.S. 342, 349 (2013).

Given the scope of the Sixth Amendment, the Second Circuit (and every other circuit to

have considered the issue) has drawn a distinction between direct and collateral consequences of

the criminal proceeding and held that the Sixth Amendment applies to the former but not the

latter.  *Chaidez*, 568 U.S. at 350 & n.7 (citing cases, including *Russo v. United States*, 173 F.3d

846 (2d Cir. 1999)).  A consequence is direct if it has a "definite, immediate and largely

automatic effect on the range of the defendant's punishment."  *United States v. Youngs*, 687 F.3d

56, 60 (2d Cir. 2012) (citation and quotation marks omitted).[2]  By contrast, a consequence is

collateral if it is not part of the criminal proceeding; examples include "the defendant's civil

liabilities, his eligibility for a variety of societal benefits, [and] his civil rights."  *Michel v. United

States*, 507 F.2d 461, 466 (2d Cir. 1974); *see Youngs*, 687 F.3d at 60 (citing cases holding that

increased penalties for future offenses and civil forfeiture are collateral consequences).

In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court addressed whether the

Sixth Amendment right to counsel encompasses advice to noncitizens about the deportation

consequences of conviction.  The Court concluded that, because it is "intimately related to the

criminal process" and "nearly an automatic result for a broad class of noncitizen offenders,"

deportation is "uniquely difficult to classify as either a direct or a collateral consequence."  *Id.* at

365–66.  Based on those considerations, the Court concluded that "advice regarding deportation

---

[2] The Second Circuit has applied the same direct-collateral distinction in the Due Process context
to resolve challenges to the knowingness and voluntariness of guilty pleas.  *Youngs* is a Due
Process case.  *See also Michel v. United States*, 507 F.2d 461, 466 (2d Cir. 1974).

8

is not categorically removed from the ambit of the Sixth Amendment right to counsel."  *Id.* at 366.

The Supreme Court took care to emphasize that it was not calling into question the vitality of the direct-collateral distinction in general and that its decision was driven by the "unique nature of deportation."  *Id.* at 365*; see also Chaidez*, 568 U.S. at 355 ("Even in *Padilla* we did not eschew the direct-collateral divide across the board.").  The holding of *Padilla* was specific and narrow: "[t]he severity of deportation . . . underscores how critical it is for counsel to inform her *noncitizen* client that he faces a risk of *deportation*."  559 U.S. at 373–74 (emphases added).

Following *Padilla*, the Second Circuit has continued to apply the direct versus collateral distinction.  In *United States v. Youngs*, 687 F.3d 56 (2d Cir. 2012), the Circuit held that civil commitment of a sex offender is a collateral consequence and that the Fifth Amendment therefore did not require the defendant to be advised of the possibility of civil commitment in connection with his plea.  The Circuit rejected the defendant's argument that *Padilla* had eliminated the direct-collateral distinction, noting that *Padilla* was driven by the Supreme Court's "deeming deportation a 'virtually inevitable' result of a noncitizen's conviction for certain offenses."  *Id.* at 62.  Civil commitment, by contrast, was "not nearly as certain" because a "district court ultimately determines whether a defendant is civilly committed" and the Government bears the burden of proving that civil commitment is appropriate.  *Id.* at 63.[3]

---

[3] *Youngs* also distinguished *Padilla* on the ground that *Padilla* arose in the Sixth Amendment context.  687 F.3d at 62.  However, *Youngs* did not suggest that, in the Sixth Amendment context, *Padilla* extends beyond advice to noncitizens about deportation.  *Id.* ("*Padilla*'s holding was limited to the requirement of counsel to advise of deportation pursuant to their Sixth Amendment responsibilities.").

### B.   Civil Denaturalization Is at Most a Collateral Consequence

Civil denaturalization is at most a collateral consequence of a guilty plea and therefore falls outside the scope of the Sixth Amendment.

In many cases, including Nunez's, civil denaturalization is not a consequence of his guilty plea at all.  In denaturalization proceedings, the Government must show that the defendant illegally procured his naturalization or procured it through hiding a material fact.  8 U.S.C. § 1451(a); *see United States v. Lemos*, No. 08 Civ. 11144 (KMW), 2010 WL 1192095, at *4 (S.D.N.Y. Mar. 26, 2010).  Naturalization form N-445 asks whether an individual has "knowingly committed any crime or offense for which you have not been arrested; or have you been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any law or ordinance?"  *See* Denat. Complaint at 8.  The form thus does not ask merely for convictions, but for criminal conduct even if the individual has "not been arrested."  *Id.*

Such was the case here.  The Denaturalization Complaint's grounds for revocation rest on Nunez's conduct, not the mere fact of his conviction.  The complaint states that Nunez "could not have established that he was a person of good moral character because during the statutory period he *committed* a felony crime involving moral turpitude."  Denat. Complaint ¶ IV.A (emphasis added) (citing 8 U.S.C. § 1101(f)(3)).[4]  And Nunez "willfully misrepresented and concealed his *criminal acts* and arrest during the naturalization process."  *Id.* ¶ V (emphasis added).  Regardless of whether Nunez pleaded guilty, what charges he pleaded guilty to, or

---

[4] As described in paragraph IV.A of the Denaturalization Complaint, an individual cannot establish good moral character if that person "has committed, or . . . admits committing acts which constitute the essential elements of a crime involving moral turpitude punishable by more than one year." *Id.*; *see* 8 U.S.C. § 1182(a)(2)(A) (rendering an alien inadmissible if "convicted of," "admits having committed," or "admits committing acts which constitute the essential elements of" a crime involving moral turpitude punishable by more than one year of imprisonment).

10

whether he was charged with a crime at all, the exact same grounds for denaturalization would exist.  Nunez engaged in a conspiracy beginning in November 2007, sold drugs the day before he was naturalized, lied about it, and for that he can be denaturalized even if he had never been convicted.

Nunez is thus wrong when he draws from *Padilla* and other cases requiring defense attorneys to advise their clients, or refrain from misadvising their clients, about the deportation consequences of their pleas.   Denaturalization—on the grounds alleged against Nunez—is completely unlike the deportation of noncitizens discussed in *Padilla*, which was legally predicated on the criminal conviction itself.  *See Padilla*, 559 U.S. at 359 n.1, 368 (citing 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted . . . [of a controlled substance offense] is deportable.")).  In the deportation context, by contrast, many defendants become removable when they are "convicted of" certain crimes.  8 U.S.C. § 1227(a)(2).   Nunez suggests that his guilty plea "violate[d] the terms and oath set forth in his naturalization process."  (Mem. at 6.)  Rather, it is the defendant's "false testimony and concealment of his criminal activity are the causes of the proceedings against him, not his guilty plea and conviction." *See Pizzuti v. United States*, No. 01 Cr. 1122 (LAP), 2019 WL 274968, at *3 (S.D.N.Y. Jan. 10, 2019) (quotation marks and brackets omitted).

Separate from the fact that Nunez's guilty plea is legally unnecessary to establish the grounds alleged for denaturalization, the guilty plea is also unnecessary for evidentiary purposes. The Government can still seek denaturalization without the guilty plea by relying on the taped recordings of Nunez selling cocaine on January 10, 2008, and FBI records of the confidential informant's participation in the sale, among other evidence.  Denat. Complaint at 55–56, 86–96. And in his denaturalization case, the district court has already concluded that the plea

documents—the indictment, plea colloquy, PSR, and fact of conviction—do not reveal when Nunez sold cocaine.  *See* Op. at 4–8.  Whether or not Nunez's conviction is vacated, the Government can succeed in the denaturalization case by offering evidence that Nunez actually engaged in criminal activity during the statutory period before his naturalization.  For these reasons, civil denaturalization is not a consequence of Nunez's guilty plea, and his failure to receive advice on denaturalization did not impair his Sixth Amendment right to counsel.  *See Pizzuti*, 2019 WL 274968, at *3.

Even if civil denaturalization could be construed to be a consequence of Nunez's guilty plea, it would at most be a collateral consequence.  Like the civil commitment found to be collateral in *Youngs*, 687 F.3d at 63, denaturalization on the grounds asserted against Nunez is "uncertain" to follow from the guilty plea because it does not turn on whether the defendant has been convicted.  Like civil commitment, denaturalization requires the Government to bring a separate civil proceeding at which the Government bears the burden of proof by clear and convincing evidence, *see Kungys v. United States*, 485 U.S. 759, 772 (1988), and the "district court ultimately determines" whether denaturalization is appropriate, *Youngs*, 687 F.3d at 63.  In short, denaturalization lacks the characteristics that led *Padilla* to treat deportation as "uniquely difficult to classify as either a direct or a collateral consequence."  559 U.S. at 366; *cf. United States v. Phattey*, -- F.3d --, 2019 WL 6605781, at *5 (9th Cir. Dec. 5, 2019) (explaining that "revocation of citizenship is not sought for the purpose of punishment" but to "remedy a past fraud by taking back a benefit to which the alien is not entitled").   Nunez had no right to the advice of counsel on that issue.

12

### C.   Nunez's Counsel Gave Reasonable Advice

While there is no Sixth Amendment right to advice regarding denaturalization, defense counsel must still satisfy an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Under that standard, "[a] defense counsel's performance is unreasonable when it is so deficient that it falls outside the 'wide range of professionally competent assistance.'" *See Kovacs*, 744 F.3d at 50 (quoting *Strickland*, 466 U.S. at 690). Many courts have recognized that "misadvice on other collateral matters besides immigration consequences—e.g. parole eligibility—is (or may be) subject to *Strickland*." *United States v. Castro-Taveras*, 841 F.3d 34, 49–50 (1st Cir. 2016) (collecting cases).

In this case, Nunez's defense counsel acted reasonably.   Nunez nowhere states that he told his lawyer that he had lied on his naturalization form, so Nunez's lawyer was not informed that Nunez's naturalization was anything other than valid. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."). And even if reasonably competent counsel at the time were aware of all the relevant facts, such counsel would not have been attentive to the risk of denaturalization. In 2008, at the time of the plea, denaturalization was "exceedingly rare," and between 1968 and 2013, "fewer than 150 Americans were denaturalized." Cassandra Burke Robertson & Irina D. Manta, "(Un)Civil Denaturalization," 94 N.Y.U. L. Rev. 402, 404, 422 (2019). One scholar explained in 2013 that denaturalization had become "primarily reserved for people who 'camouflaged crimes against humanity prior to their immigration.'" *Id.* (quoting Patrick Weil, The Sovereign Citizen: Denaturalization and the Origins of the American Republic 179 (2013)). Even more recent criminal defense standards do not call for defense counsel to consider denaturalization risks. *See* ABA Criminal Justice

Standards for the Defense Function 4th Ed., 4-5.5 (2017) (encouraging defense counsel to consult with an expert "[i]f defense counsel determines that a client may not be a Untied States citizen" and describing risks including "denial of citizenship" but not denaturalization).

In any event, if Nunez's defense counsel had been aware of the risks of denaturalization, he would have known that it was Nunez's conduct, rather than his conviction, that created such a risk. *See Pizzuti*, 2019 WL 274968, at *3. And Nunez's counsel nonetheless obtained a plea which did not require him to acknowledge specifically any acts occurring before the date of his naturalization, as the district court in the Eastern District of New York has concluded.

Since denaturalization is distinct from deportation, the question here is not resolved by Second Circuit cases holding that misadvice regarding the deportation consequences of a guilty plea constitutes ineffective assistance of counsel. *See Kovacs*, 744 F.3d at 50–51; *United States v. Couto*, 311 F.3d 179, 187 (2d Cir. 2002).[5] Rather, those cases show the stark difference between misadvice about deportation and the facts here. For decades prior to the Second Circuit's recognition that misadvice concerning deportation was per se ineffective assistance, it had indicated as much in dicta. *Kovacs*, 744 F.3d at 50–51 (describing cases going "as far back as the 1970s"). And when the court turned that dicta into a holding, it also relied on standards for defense counsel that were evolving in the lead up to *Padilla*. *Couto*, 311 F.3d at 187–88 (citing, among other resources, ABA standards). No such lineage or standards are present here.

---

[5] In *Rodriguez v. United States*, 730 F. App'x 39 (2d Cir. 2019) (summary order), the court found ineffective assistance for misadvice in the denaturalization context. *Id.* at 42. The Government hardly contested the issue and distinguished deportation from denaturalization, *see* Brief for the United States, *Rodriguez v. United States*, No. 16-3739, 2017 WL 1208723, at *17 (2d Cir. Mar. 30 2017), and the summary order is not binding on this Court. *See* 2d Cir. Local R. 32.1.1(a).

**II.**    **Nunez Was Not Prejudiced By Any Error By His Counsel**

Assuming that Nunez's counsel was ineffective by misadvising him about the consequences of pleading guilty, he must "affirmatively prove prejudice arising from counsel's allegedly deficient representation."  *United States v. Cohen*, 427 F.3d 164, 167 (2d Cir. 2005) (internal quotation marks omitted).  In the context of misadvice about immigration consequences, a defendant must "clearly demonstrate that he placed particular emphasis on immigration consequences in deciding whether or not to plead guilty." *Doe*, 915 F.3d at 911 (alteration and internal quotation marks omitted).  In addition, the defendant must show that, "but for counsel's unprofessional errors, there was a reasonable probability that the petitioner could have negotiated a plea that did not impact immigration status or that he would have litigated an available defense."  *Doe*, 915 F.3d at 911 (internal quotation marks omitted); *see Kovacs*, 744 F.3d at 52 ("[A] petitioner must demonstrate a reasonable probability that the prosecution would have accepted . . . a deal that had no adverse effect on the petitioner's immigration status.").  Nunez has failed to meet that standard here.

First, Nunez has not demonstrated that he placed particular emphasis on immigration consequences in his plea decision.  Such a showing must be made through "contemporaneous evidence," and not solely from "*post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies."  *Doe*, 915 F.3d at 911 (quoting *Jae Lee v. United States*, 137 S. Ct. 1958, 1967 (2017)).  For instance, in *Jae Lee v. United States*, the petitioner established that "deportation was the determinative issue in Lee's decision whether to accept the plea deal" through a conversation about the issue during the plea colloquy, and not just with testimony by both the petitioner and his criminal counsel that he would have gone to trial rather than risking deportation.  137 S. Ct. at 1968 (internal quotation marks omitted); *see Kovacs*, 744

F.3d at 53 (concluding that the defendant's "single-minded focus" on immigration consequences was "apparent from the transcript of the Rule 11 hearing" and discussion at sentencing about an affirmative defense).  In *Rodriguez v. United States*, 730 F. App'x 39 (2d Cir. 2018) (summary order), the court remanded for further development of the record on the defendant's emphasis on avoiding immigration consequences during the plea, even though the defendant offered an "unequivocal[]" affidavit that she would have vacated her plea upon being advised of negative immigration consequences, and even though defense counsel "repeatedly emphasized at the plea proceedings that Rodriguez's sole concern with respect to a sentence was to ensure that she would be able to continue working in the United States to financially support her family." *Id.* at 43–44.  On remand and following a hearing, Rodriguez withdrew her motion because she thought she would not be able to establish that she was prejudiced by any misadvice.  *See* Letter, *United States v. Rodriguez*, No. 14-CV-8214-LAP (S.D.N.Y.), ECF 39.

The evidence here falls far short of those cases.  The contemporaneous record offers no indication that immigration consequences were front of mind as Nunez decided whether to plead guilty. At the plea, the only reference to immigration occurred when Nunez said that he was a citizen. 10/22/08 Tr. at 8:15–16, ECF No. 27. The PSR merely notes that Nunez was naturalized on January 11, 2008, PSR ¶¶ 43, 45, and the issue was not discussed at sentencing.  Nunez's current counsel states that Nunez's defense counsel did not recall the details of the case. Affirmation of Edward Zaloba ¶ 9, ECF No. 95; *cf. Doe*, 915 F.3d at 192 ("Doe's defense counsel also said in an earlier statement that . . . counsel and Doe relied on the representations the Government gave them at the time of Doe's plea.").  The primary evidence, then, is Nunez's *post hoc* affidavit attached to his submission. *See* Affidavit of Martin Smeling Nunez ¶¶ 9–10,

13–14, 33, 35–40, ECF No. 95-1.  That alone is insufficient.  *See Lee*, 137 S. Ct. at 1967;

*Rodriguez*, 730 F. App'x at 43.

Second, Nunez has not shown a reasonable probability that he could have negotiated a

more favorable plea or gone to trial.  The Supreme Court has explained that "[a] defendant

without any viable defense . . . will rarely be able to show prejudice from accepting a guilty plea

that offers him a better resolution than would be likely after trial."  *Lee*, 137 S. Ct. at 1966.  Such

is the case here: Nunez has identified no affirmative defense he would have raised, and the

Government's evidence was overwhelming.  For instance, as described in the PSR, Nunez

engaged in a series of recorded calls with an FBI confidential witness that culminated in three

drug sales to the witness, at least two of which were recorded.  *See* PSR ¶¶ 11–19.  Of special

relevance, Nunez sold approximately 35 grams of heroin in the first recorded sales, which

occurred prior to Nunez's naturalization.  *See* PSR ¶ 13; Denat. Complaint at 55–56, 86–96.

Nunez had "no plausible chance at acquittal."  *Lee*, 137 S. Ct. at 1966.

Nunez argues instead that he would have negotiated a plea only to criminal activity

occurring after his date of naturalization.  (Mem. at 10–11, 14.)  That is incorrect.

Nunez's crimes triggered a ten-year mandatory minimum which he was able to avoid—

instead receiving a sentence of 57 months, subsequently reduced to 47 months—only by

operation of the safety valve.  *See* 18 U.S.C. § 3553(f); PSR ¶ 6C (citing 21 U.S.C.

§ 841(b)(1)(A)).  That safety valve required Nunez to provide the Government "all information

and evidence the defendant has concerning the offense," *id.* § 3553(f)(5), a fact explained to

Nunez at the time of his plea, 10/22/08 Tr. at 9:3–7, ECF No. 27 (telling Nunez that the safety

valve requires him to "provide the government truthfully with *all* information you have about the

offense of conviction" (emphasis added)).  Accordingly, in order to obtain the safety valve,

Nunez had to concede to the Government—if not actually in his record of conviction, *see* Op. 8—that he was involved in pre-naturalization criminal conduct.

A plea to an indictment that contained no overt acts prior to his date of naturalization would therefore not have been "more favorable."   Nunez would still have had to admit his pre-naturalization criminal conduct to the Government, and the Government could still have initiated denaturalization proceedings.   Under both Nunez's actual plea and the one he suggests, the alternative was a prison sentence of more than double length.  *Cf. Lee*, 137 S. Ct. at 1968–69 (explaining that some defendants might go to trial if deportation is the "determinative issue" and "the consequences of taking a chance at trial were not markedly harsher than pleading").   And under Nunez's actual plea, just as in the plea Nunez suggests, he made no express admission to criminal conduct prior to his naturalization date, as the district court in the Eastern District concluded.

In any event, Nunez has not shown that "the prosecution would have accepted, and the court would have approved," a plea only to overt acts postdating his naturalization.  *Kovacs*, 744 F.3d at 52 (internal quotation marks omitted).  This is not a case in which the Government was aware of the defendant's immigration concerns and agreed to accommodate them.  *See Doe*, 915 F.3d at 908 ("[Defense counsel] and Doe had relied on the Government's assurances that it would do everything possible to keep Doe in the country."); *Kovacs*, 744 F.3d at 53 ("[T]he misprision of felony charge was settled on in the plea negotiation for the sole reason that [defense counsel] believed it would not impair Kovacs' immigration status—a view [counsel] conveyed to the prosecution."); *cf. Rodriguez*, 730 F. App'x at 43 n.2 (explaining, when remanding for more facts, that it was "plausible" that defense counsel could have negotiated to avoid denaturalization).  To the contrary, Nunez has made no showing that the Government

would have agreed to help Nunez evade responsibility for lying in his naturalization proceedings by negotiating a plea without immigration consequences.  "'Because a defendant has no right to be offered a plea,' the ultimate outcome of a plea negotiation depends on whether the government is willing to agree to the plea the defendant is willing to enter."  *Kovacs*, 744 F.3d at 52 (alteration omitted) (quoting *Missouri v. Frye*, 566 U.S. 134, 148 (2012)).

\* \* \*

The Government accordingly believes that Nunez's petition for a writ of error *coram nobis* should be denied on the papers.  If the Court disagrees, the Government requests the opportunity to obtain a waiver of attorney-client privilege so the Government can examine Nunez's defense counsel and develop the record as to (1) whether Nunez in fact was affirmatively misadvised as to the immigration consequences of his plea, and (2) whether Nunez made clear to his lawyer that concerns about his immigration status were paramount in his plea negotiations.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that Nunez's

petition be denied.


Dated:  New York, New York
        December 6, 2019


                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York


                        By:     _____
                                        Andrew A. Rohrbach
                                        Assistant United States Attorney
                                        (212) 637-2345